Carl L. BALDWIN and Alexinia Baldwin, Appellants,

v.

J. W. MORGAN et al., Appellees.

No. 18280.

United States Court of Appeals Fifth Circuit.

Feb. 17, 1961.

Oscar W. Adams, Jr., Birmingham, Ala., for appellant.

J. Asa Rountree, Jos. F. Johnston, Birmingham, Ala., for appellee, Birmingham Terminal Co., Cabaniss & Johnston, Birmingham, Ala., of counsel.

Gordon Madison, Asst. Atty. Gen., MacDonald Gallion, Atty. Gen., William F. Black, Montgomery, Ala., for Morgan, Connor and Waggoner.

J. M. Breckenridge, Asst. City Atty., Birmingham, Ala., for Alabama Public Service Comm.

Before RIVES, BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

■ This case presents again the question of asserted unlawful segregation of races in the Railroad Terminal Station at Birmingham, Alabama. After a trial following our remand, Baldwin v. Morgan, 5 Cir., 1958, 251 F.2d 780, the District Court denied all relief sought by the Negro plaintiffs against the City Commissioners, the Alabama Public Service Commission, and the Birmingham Terminal Company, a private corporation.[1] The fact findings after a full trial come here with the insulation of F.R.Civ.P. 52(a), 28 U.S.C.A. While we reach a conclusion contrary to that of the District Court, we do so on the basis of the facts which are substantially without controversy. We do not credit any evidence either expressly or impliedly rejected by the District Judge.[2]

We think that a basic error in the District Court's action was the assumption that all that was involved was forcible segregation of the races and not other practices related to race and color which were equally impermissible under the Fourteenth Amendment and the Civil Rights Acts, 42 U.S.C.A. § 1981, § 1983. As to each defendant this led the Court to focus on the issue of whether segregation was compulsory. Finding, as it did, that while separate facilities were to be and were furnished for the use of the races, neither the Commission, the City nor the Terminal coercively compelled occupancy of one to the exclusion of the other, the Court concluded that no case was made out. No doubt this was the main thrust of the plaintiff's complaint as the analysis of it in our prior opinion reflects. But this approach failed to take into account or properly evaluate in the light of federal constitutional requirements the virtually uncontradicted state action in which race was the significant factor. It also seems quite clear that despite Browder v. Gayle, D.C.M.D. Ala.1956, 142 F.Supp. 707, affirmed 1956, 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114, the defendants, if not the Court, labored under the misconception that race as an impermissible basis for distinction related to *interstate* commerce only and not to *intrastate* passengers.

The significant physical facts are simple and undisputed. The Terminal, a private corporation owned by specified railroads serving Birmingham, maintains a passenger station for arriving and departing passengers. This includes waiting rooms and the usual facilities for travelers as well as those of the public who are there awaiting the arrival or departure of passengers. There are two main but separate waiting rooms. Each is directly accessible through separate entrances on the track side of the depot and the street side. Over at least one entrance on the track concourse side, and again on the street side, signs were posted marking one as the Negro waiting room and the other for whites. As to one, the legend in large letters read:

---

1. These will be referred to as the City, the Commission, and the Terminal.

2. This means that we reject altogether the testimony of the witness Michel even though we have some doubt that the District Judge's characterization "I find incredible the testimony of the witness Michel and I reject that testimony and its implications. * * * I don't believe she heard what she said she heard or saw what she said she saw. * * *" was meant to discredit more than those portions such as long distance lip reading, purporting to tie the Terminal into action by the City policemen. Likewise we disregard the incident concerning the removal and subsequent arrest and conviction of Dr. Juanita Pitts which the District Judge presumably attributed to her conduct and not her color.

"Colored Intrastate
Passengers
Waiting Room."

Over the other the sign read:

"Waiting Room
Interstate and White
Intrastate Passengers."

The Public Service Commission.

Whether, as suggested by the Terminal, the signs are merely intended by it as an invitation to each of the races to occupy these facilities separately provided in order to permit voluntary acceptance of traditional social customs of the South is not significant so far as the Commission is concerned. The Commission, an arm of the State of Alabama, pursuant to a specific statute is authorized to *require* separate waiting rooms.[3] And it has done so by mandatory official regulation published as early as 1923.[4] Moreover, because of intervening decisions forbidding racial discrimination as to facilities employed in interstate commerce [5] the Commission in 1956 made the requirement even more emphatic. Of dominant significance for our purposes, the Commission's new Order T-21 required, for the first time, the posting of signs—in lettering of "contrasting color" clearly visible for at least fifty feet—to mark the separate rooms maintained for each of the races.[6] The Commission both in its contentions generally and in objections to admissibility of the regulations,

3. Alabama Code 1940, Title 48, § 186.
"Every railroad company in this state, on the order of the public service commission, shall provide * * * and maintain * * * depot buildings for the accommodation of passengers * *. And said railroad company * * * must have, when required by the public service commission, * * * sufficient sitting or waiting rooms, to be determined by the commission, for passengers waiting for trains, having regard to sex and race * * *."

4. Alabama Public Service Commission General Order No. T-2 (1923).
"All common carriers by rail shall provide and maintain at each of their passenger depots * * * for the comfort and accommodation of passengers waiting for or departing from trains, separate sitting or waiting rooms for the white and negro races * * *. There shall also be maintained * * * toilet facilities, * * * separately for males and females of the white and negro races * * *."

5. The precipitant was the decision of the Interstate Commerce Commission in NAACP v. St. Louis-San Francisco Ry. Co., 297 I.C.C. 335 decided November 7, 1955. It was hardly unexpected in view of Mitchell v. United States, 1941, 313 U.S. 80, 61 S.Ct. 873, 85 L.Ed. 1201; Henderson v. United States, 1950, 339 U.S. 816, 70 S.Ct. 843, 94 L.Ed. 1302; and see Morgan v. Commonwealth of Virginia, 1946, 328 U.S. 373, 66 S.Ct. 1050, 90 L.Ed. 1317, resting upon Article 1, Section 8 of the Constitution; Boynton v. Commonwealth of Virginia, 81 S. Ct. 182, 5 L.Ed.2d 206.

6. "In re: Signs for Common Carrier Waiting Rooms—Docket 14072.
"The Commission having under consideration the matters of rules and regulations governing carriers by railroad and by bus in the State of Alabama in the providing and maintenance of passenger stations or depots;—
"It Is Ordered by the Commission, that the general order set forth below be, and the same is hereby, adopted and designated as the Commission's General Order No. T-21:
"Wherever passenger stations or depots are maintained in Alabama by common carriers by rail * * * there shall be placed by the carrier at or near the entrance of the waiting room designated for the Negro race an appropriate sign or signs indicating the location of the colored waiting room and such sign or signs shall contain this language: 'Colored Waiting Room,' and there shall be placed by the carrier at or near the entrance of the waiting room designated for the white race an appropriate sign or signs designating the location of the 'White Waiting Room,' and such sign or signs shall contain this language 'White Waiting Room', and the lettering on such sign or signs shall be of such size as to make the same clearly visible at a distance of at least 50 feet and such lettering shall be of a contrasting color so as to provide reasonable visibility.
"It Is Further Ordered * * * that this order shall be effective as of the date hereof * * *.
"Dated * * * the 8th day of February, 1956."

recognized that as to interstate commerce neither the statute nor the regulations could survive in the face of the contrary and superior rulings (see note 5, supra). But as to intrastate passengers it either took the view that somehow the regulation was valid or at least the Baldwins as victims of discrimination during interstate commerce were not in a position to assert this as a class suit for intrastate travelers.

■ But the vice here is not the impermissible distinction between *inter* and *intra*state commerce or even the absence of an explicit purpose coercively to compel segregated occupancy (as distinguished from the maintenance of ·separate rooms). What is forbidden is the state action in which color (i. e., race) is the determinant. It is simply beyond the constitutional competence of the state to command that any facility either shall be labeled as or reserved for the exclusive or preferred use of one rather than the other of the races. Certainly the state may not directly or through a municipality prescribe that a certain area of the city is to be inhabited by Negroes, another by whites, or that such areas are to be so marked even though no sanctions are imposed as to occupancy. Cf. Shelley v. Kraemer, 1948, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161; Harmon v. Tyler, 1926, 273 U.S. 668, 47 S.Ct. 471, 71 L.Ed. 831, reversing 160 La. 943, 107 So. 704, first appeal 158 La. 439, 104 So. 200; Buchanan v. Warley, 1917, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149. The factor of race is irrelevant from a constitutional viewpoint. Boson v. Rippy, 5 Cir., 1960, 285 F.2d 43 and see especially supplemental opinion [December 7, 1960]. And in testing state action, we have recognized that there may be need of the "protection of a court order making certain that the factor of race would not be a consideration. * * *" and that there be "a decree of the trial court prohibiting the consideration of * * * race * * * as a relevant factor * * *" Mannings v. Board of Public Instruction, 5 Cir., 1960, 277 F.2d 370, 375.

■ This is not to say that integration in all activities must be governmentally compelled. We, and others, have clearly indicated to the contrary. City of Montgomery, Alabama v. Gilmore, 5 Cir., 1960, 277 F.2d 364, at page 369 and notes 5 and 6. But the State may not either compel segregation in use or the maintenance or making of separate facilities where the criteria is race or color.

■ It follows that the orders of the Commission as well as the underlying statute (note 3, supra) are constitutionally invalid insofar as they require that the Terminal provide, maintain and mark separate facilities on the basis of race. This is so without regard to whether in fact the segregated use or occupancy of such waiting rooms is coercively compelled either by the Commission, the City or the Terminal. On remand, appropriate injunctive and declaratory orders should issue.

The Birmingham Terminal Company.

In assaying the position of the Terminal the trial seemed preoccupied with efforts to tie the Terminal into action by police officers of the City. Presumably this was to make out State action. See, e. g., 251 F.2d 780, 788 and notes 8–11. This was in response to the contention and proof offered by the Terminal that it was indifferent to where Negroes sat— either in the "Interstate and White" or "Colored Intrastate" waiting rooms—and without regard to their status as inter or intra-state travelers. We accept [7] the District Court's finding that the proof did not show a sufficient connection between acts of City officers and the Terminal concerning any custom or practice or usage to compel Negroes to occupy the waiting room.

■■ But again this approach was too narrow. The Terminal was admittedly a public utility holding itself out to serve all of the traveling public desiring to use the railroads operating through

7. See note 2, supra.

this station in Birmingham.[8]  As we pointed out at some length in Boman v. Birmingham Transit Company, 5 Cir., 1960, 280 F.2d 531, 535, one engaged in Alabama as a public utility "is doing something the state deems useful for the public necessity or convenience." When in the execution of that public function it is the instrument by which state policy is to be, and is, effectuated, activity which might otherwise be deemed private may become state action within the Fourteenth Amendment. And whether it is state policy is to be determined by the nature of the activity in terms of the governmental nature of the function and not the mere presence or absence of power in the state's vicarious "agent" to impose criminal sanctions. So much is clear from Smith v. Allwright, 1944, 321 U.S. 649, 658, 663, 64 S.Ct. 757, 88 L.Ed. 987, 994, 997. To this may be added Terry v. Adams, 1952, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 and many others.[9]  Boman v. Birmingham Transit Co., supra, is not to the contrary.

Here the statute infuses the Commission with power to prescribe that carriers shall maintain separate waiting rooms and this power has been effectuated by the issuance of regulations that leave nothing to the imagination. The last order compels the posting of visible signs clearly indicating which waiting room is for whites and which is for colored. The state does not physically post the signs, but it does so just as effectively through the instrument of the Terminal. The very act of posting and maintaining separate facilities when done by the Terminal as commanded by these state orders is action by the state.[10]

8. The Terminal inferentially doubts that it is a "railroad company" within the meaning of the Alabama Statute, note 3, supra, or a "common carrier by rail" as specified in General Order No. T–2 or T–21, notes 4 and 6, supra. Of course, the depot is maintained solely because of the presence of the railroad facilities operated by the owner-lines who, but for the Terminal corporation, would be compelled pursuant to statute to maintain the required station. As to interstate commerce the Terminal is clearly a common carrier. 49 U.S.C.A. § 1(3) (a); Boynton v. Commonwealth of Virginia, 81 S.Ct. 182, 5 L.Ed.2d 206.

9. United States v. McElveen, D.C.1959, 177 F.Supp. 355; D.C., 180 F.Supp. 10, affirmed sub. nom. United States v. Thomas, 1960, 362 U.S. 58, 80 S.Ct. 612, 4 L.Ed.2d 535; Rice v. Elmore, 4 Cir., 1947, 165 F.2d 387, 391, certiorari denied 333 U.S. 875, 68 S.Ct. 905, 92 L.Ed. 1151; Chapman v. King, 5 Cir., 1946, 154 F.2d 460, certiorari denied 327 U.S. 800, 66 S.Ct. 905, 90 L.Ed. 1025; Baskin v. Brown, 4 Cir., 1949, 174 F.2d 391. We think the cases warrant the following summary.

When private individuals or groups are endowed by the State with powers or functions governmental in nature they become instruments of the State and subject to the same constitutional limitations as the State itself. Thus, a private party operating a municipality acts for the State and must conform to the standards of the Fourteenth Amendment (Marsh v. State of Alabama, 1946, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265); a privately-owned public transportation system operating in the District of Columbia, and with its authorization, is bound by the due process clause of the Fifth Amendment (Pollak v. Public Utilities Commission, 1951, 89 U.S.App.D.C. 94, 191 F.2d 450, reversed on other grounds 343 U.S. 451, 72 S.Ct. 813, 96 L. Ed. 1068); private lessees who operate publicly-owned facilities such as swimming pools or parks may not discriminate racially (Lawrence v. Hancock, D.C.S.D. W.Va.1948, 76 F.Supp. 1004; Department of Conservation & Development, etc. v. Tate, 4 Cir., 1956, 231 F.2d 615, certiorari denied 352 U.S. 838, 77 S.Ct. 58, 1 L.Ed.2d 56); and a labor union granted the power to bargain collectively by a federal statute may not use the power to discriminate racially (Brotherhood of Railroad Trainmen v. Howard, 1952, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283; Syres v. Oil Workers International Union, 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785; cf. Steele v. Louisville & Nashville R. Co., 1944, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173).

10. There can be no real question that this was done pursuant to state order. The Trial Court found as much.
"* * * [S]eparate waiting rooms in such station are provided for white and colored passengers in obedience thereto

As we have pointed out above the State may not use race or color as the basis for distinction. It may not do so by direct action or through the medium of others who are under State compulsion to do so. The action of the Terminal—a public utility and an arm of the State in the execution of this State policy—in posting and maintaining the signs and the separate waiting rooms on the basis of color is equally forbidden. On remand this should be appropriately proscribed by suitable injunctive and declaratory orders.

### Board of Commissioners of the City of Birmingham.

In the District Court's memorandum opinion it formally found that the "city commissioners * * * are not pursuing a custom, statute or usage which denies plaintiffs and all other Negroes similarly situated the right to use the waiting room at the Terminal designated 'Interstate and White Waiting Room.' They have issued no orders during the year 1956, or subsequently thereto, pursuant to which plaintiffs and other Negroes who use such waiting room are subject to arrest and confinement in jail."

In arriving at that conclusion we may assume that the Court rejected altogether the testimony of Michel and Dr. Pitts, see note 2, supra, showing four specific incidents where Negroes were either arrested by city policemen or required by a policeman to move from the "Interstate and White" waiting room. Of course, the Court could not, nor did it attempt to, reject the uncontradicted testimony that on December 22, 1956, the Baldwins were arrested and taken to jail because they were in the white waiting room though in possession of interstate travel tickets. Presumably it thought these "regrettable arrests * * * which indubitably triggered this litigation * * *" was but an isolated incident and would serve no basis for declaratory or injunctive orders since on the trial of the criminal charges against the Baldwins, the state court on motion of the City entered a *nolle prosequi*.

We think, however, that the balance of the evidence—coming as it did entirely either from the Commissioner who was called as an adverse witness or by witnesses proffered by the City—demonstrates without any dispute whatsoever that there is a custom, practice and usage of the City and its policemen acting under color of office which denies equal protection of the law. As to such actions the plaintiffs are entitled to a positive declaration and apropriate injunctive orders. In reaching this conclusion, we again stress that we do not credit any testimony discredited. We do not accept any testimony rejected. We take the testimony of the City's witnesses, its Police Commissioner, its Chief of Police, another supe-

---

[the order T–21], * * *."
This is not weakened by the continuing phrase which merely states that the Terminal takes no action to enforce separate occupancy.
" * * * the custom and usage observed by these defendants is to remit to the voluntary choice of members of both races the use of either waiting room."
In its formal answer the Terminal, of course, acknowledges the existence of Orders T–2 and T–21, see notes 4 and 6, supra, issued by the Commission. It denies that such orders require the Terminal to take any actions against an individual and denies that any such action has been taken. But it is clear from the answer that the Terminal considers that the state order does compel it to maintain the separate rooms with appropriate

signs. "Said order requires only that this defendant maintain waiting rooms and other facilities appropriately designated for the convenience of those who wish to conform to the long established social customs of the communities in which this defendant does business * * *." Later on it alleged: "Defendant admits that it maintains waiting rooms which make possible the separation of the races both as to those who are *required* by statute or *order* of the Alabama Public Service Commission *to conform* to the custom and practice of racial separation, and as to those who desire by that course, voluntarily and without respect to compulsion of law, to contribute to the maintenance of interracial good-will * * *" (Emphasis added.)

rior officer, and a patrolman precisely at its face value.

■ At the outset it seems quite plain that despite the extended discussion of this in our prior opinion, 251 F.2d 780, especially at pages 786–787, the District Court in its ruling seemed to believe that some specific ordinance or formally promulgated policy had to be established before the City and its agents could be said to be acting under color of office. But this is not the test. If city policemen, with the color of office which their uniform, badge, display of authority and available arms reflects, undertake as policemen to subject persons to treatment which denies them a constitutionally protected right, it is state action. It is state action though in excess of actual legal authority or even if done without formal authorization. The record must therefore be examined to see whether the police department and its employees are undertaking to use race as the basis

for determining the right of occupancy of either of the waiting rooms in the Terminal. To answer that inquiry it is necessary to take into account what was done before 1956 and that which was done (or not done) after 1956. The year 1956 has dominant significance because it was in that year that the Alabama Public Service Commission issued its order, note 6, supra, on signs. This in turn was precipitated by the final authoritative rulings which eliminated all doubt as to interstate commerce, see note 5, supra.

Prior to that time it was considered an offense—at least sufficient to call for action by a policeman in the Terminal— for a Negro to occupy the white waiting room.[11] Along came the ICC Order which put an end to discrimination as to interstate passengers. The police department became aware of this[12] and it brought about the discussion of the steps to be taken by the police which resulted finally in the issuance of an authoritative order[13] to check the tickets of Negro

11. This was established by Captain Halley then captain of personnel and a long-time career officer of the police department who, at the time of the Shuttlesworth incident on March 6, 1957, was captain of detectives. Rev. Shuttlesworth and his wife, known integration leaders, were in the white and interstate waiting room. One had an interstate ticket, the other an intrastate ticket. On complaint by someone, Captain Halley arrived and as senior officer took over. In answer to a question whether he had known of any orders regarding segregation as to intrastate passengers, he answered:

"A. Only in this one particular instance in 1957 [Shuttlesworth] I gave instructions to not make an arrest for that specific offense unless the, unless he performed some disorder. * * *

"Q. I believe you said that there were orders issued not to make any arrests on that particular offense. Captain, Halley, what particular offense were you referring to at that time? A. The occasion that the Rev. Shuttlesworth and his wife were sitting in the white waiting room."

After acknowledging the known existence of the 1955 ICC order on interstate passengers, he testified:

"Q. Now what, if anything, has the City of Birmingham done differently with

reference to the Terminal Station since the Interstate Commerce Commission ruling? * * * A. Different?

"Q. What have they done which is different from what they had done before the ruling? A. They have refrained from making arrests for that specific type of offense. It was considered an offense prior to the ruling."

12. For example, Captain Halley testified:

"Q. Are you familiar with * * * the rulings of the Interstate Commerce Commission with respect to segregation in the waiting room facilities? A. I am.

"Q. Do you know when that ruling came out? A. It was prior to this date, several months. I am not positive.

"Q. Prior to 1956? A. '57."

13. Defendant Connor, the Public Safety [police] Commissioner testified:

"Q. Mr. Connor, have you ever given any instructions to the police officers of the City of Birmingham with refence to Negroes sitting in the so-called white waiting room? A. Yes.

"Q. What instructions did you give them? A. Sometime in 1958, after I took office [November 1957], the Chief-of-Police asked me what we were going to do about, said he had got some calls about the Terminal Station and asked what we were going to do about it. I said

travelers to see whether they were for an interstate trip. As understood by the man on the beat, the lone patrolman called as a witness (by the City) translated this order into plain terms: On receipt of a complaint that a Negro was in the "Interstate and White" waiting room the ticket should be checked and if it was not an interstate ticket the person would be required to move.[14]

This establishes two things. First, a Negro is treated differently and solely because of his race. He, unlike a white traveler, is required to establish his "right" to sit in the room marked "Interstate and White Intrastate Passengers." Second, the test is whether the Negro is an interstate traveler. This latter has special significance in the light of the uncontradicted pre-1956 practice, custom and usage of the Birmingham police to treat occupancy by a Negro of the white waiting room as an offense. More than that, when the impact of the ICC order led the police to conclude that it forbade any action as to interstate travelers, no order of any kind was given affecting the previous custom and usage concerning intrastate passengers.[15]

■ Of course, the intrastate as distinguished from interstate status is wholly irrelevant. Certainly since Browder v. Gayle, D.C.M.D.Ala.1956, 142 F.Supp. 707, affirmed 1956, 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114, it is too late now to question the absolute right of Negroes engaged in intrastate commerce to be free

as long as they have an interstate commerce ticket you can't do nothing."

Jamie Moore, Chief-of-Police since November 1955, testified:

"Q. Have you issued any instructions to officers relative to negroes sitting in the white interstate and white waiting room at the Terminal Station? A. Yes, sir, I have.

"Q. What are those instructions? A. Those instructions are that negroes who are travelling in interstate, passengers, not to bother them, not to make an arrest.

"Q. Not to make an arrest? A. Yes, sir.

\* \* \* \* \*

"Q. Mr. Moore, in giving your instructions not to arrest any Negroes in the Terminal Station who were interstate passengers, did you ask your officers to examine their tickets to determine if they were interstate passengers or not? A. My instructions were if they received a call to ask the party they were complaining against if they were travelling interstate and to see their ticket."

\* \* \* \* \*

"Q. By whose direction, sir, did you issue that order to determine if a passenger was an interstate passenger in the waiting room marked interstate and white passengers.

\* \* \* \* \*

"[A] Commissioner Connor was of course familiar with the order. I discussed it with him but so far as telling me directly to issue it I would say it was my own order with his consent."

14. Patrolman Shaffner whose patrolcar covered the Terminal testified:

"Q. I will ask you whether you have received any instructions from your superiors in the Police Department? A. I have.

"Q. About Negroes sitting in the waiting room at the Terminal Station marked interstate and white waiting room? A. Yes, sir.

"Q. What are those instructions? A. We have been instructed to see if they have tickets and if they have tickets not to bother them and if they don't have tickets to make them move.

"Q. If they don't have tickets? A. Yes."

15. Commissioner Connor testified:

"Q. You have given no instruction with reference to Negroes in intrastate travel? A. No."

The Chief-of-Police, Jamie Moore, stated:

"Q. Have you issued any orders as to whether an intrastate passenger sitting in the waiting room marked interstate and white passengers, have you issued any orders to your officers concerning those persons? A. I have not."

Captain Halley, Chief of Personnel, testified:

"Q. Since the Interstate Commerce Commission ruling, has the Police Department issued any orders stating that there should not be any arrests of Negroes who were intrastate passengers sitting in the interstate and white passenger waiting room? A. I don't know of any orders that have been given on the intrastate passengers."

from discrimination by police officers on the basis of race.

▉ And yet it is plainly evident that whenever a complaint is received reporting that a Negro is sitting in the "Interstate and White Intrastate" waiting room, the police officer is required to, and does, demand to see the tickets to verify the interstate status. As to those in interstate status, this is itself a denial of equal protection by policemen since white interstate travelers are not subjected to like treatment. As to those in intrastate status, it is likewise a clear violation of the Constitution for a policeman, simply because the traveler is a Negro, to require that he prove his right to be there. And it only becomes more aggravated if, after determination of status as an intrastate passenger, the policemen in accordance with the long standing custom, practice and usage not to this date rescinded requires the intrastate passenger to leave. The briefs undertake to assert that the record shows no such discrimination toward intrastate Negro travelers. But on close examination it does no such thing. All it shows is that no intrastate Negro passenger has ever been seen in the white waiting room; only interstate Negro passengers have been found there and no interstate Negro passenger has ever been required to move.[16] Indeed, the sign sets up the basis of separation as to intrastate passengers. If white they go to one room, if colored to the other.

The sum of it is that on this uncontradicted record the police of Birmingham consider that the right to remain in the "Interstate and White Intrastate" waiting room requires one of two conditions: (a) the person be white or (b) if colored, he be an interstate traveler. The obverse is just as obvious: if not white or colored with an interstate status, the person must move. Negroes are entitled to be free of that discrimination at the hands of state, city and police officials. The City has, to be sure, recognized that as to interstate passengers it may not enforce its prior practices. But in the very execution of that policy, by the demand for examination of the tickets it inescapably violates the demands of the Constitution that a Negro traveler sitting in the waiting room be treated as would a white traveler on the next bench. The Negro plaintiffs and those for whom they sue as a class are entitled to appropriate injunctive and declaratory orders that will obliterate the supposed distinction between interstate and intrastate passenger status as well as the use of race or color as the basis for occupancy of either one or both of the waiting rooms of the Terminal.

The result is that the cause must be reversed and remanded for further appropriate orders as to each of the separate defendants adapted to the actions of each which we find to be in violation of the Fourteenth Amendment and the Civil Rights Acts. In reaching this conclusion

16. For example, Captain Halley, the Chief of Personnel, testified:
"Q. I believe you said you knew of no Negro sitting in the interstate and white waiting room at the Terminal Station other than the ones with interstate tickets. Is that correct? A. Yes, sir."
And Patrolman Shaffner testified:
"Q. I will ask you whether or not in the past year you have seen any Negroes sitting in the white waiting room at the Terminal Station who did not have tickets? A. No, sir.
"Q. I will ask you whether or not in the past year you have seen any Negroes in the interstate and white waiting room at the Terminal Station who had intrastate tickets? A. No, sir.

"Q. Have you seen Negroes sitting in the waiting room marked interstate and white passengers? A. That is right.
"Q. Have there been many or few sir? A. Well, whenever I checked it I would say maybe once a week or twice a week I would see someone in there.
"Q. Now, Mr. Shaffner, on these occasions when you saw these people sitting there did you check their tickets? A. I did.
"Q. Do you recall whether they were interstate or intrastate passengers? A. All of them were passing through.
"Q. Going to another state? A. That is right."

we certainly do not disagree with the principles so well stated by the District Court. "While no law, or custom or usage which is the equivalent of law, may compel the segregation of races in the area of public transportation, it is equally clear that people of good will of both races are free to observe traditions which for generations have been an intimate part of their way of life." Similar and related factors set forth as reasons in support of our action led us to the modification of the decree in City of Montgomery, Alabama v. Gilmore, 5 Cir., 1960, 277 F.2d 364, 368–370.

Reversed and remanded.