J. Irwin Shapiro, J.
This is an article 78 mandamus proceeding in which petitioner seeks an order directing the Medical Society of the County of Queens, Inc., to admit him to membership in that society.
Petitioner graduated from and was awarded the degree of Doctor of Osteopathy (D.O.) by the Philadelphia College of Osteopathic Physicians and Surgeons in 1960. The required curriculum of that institution is similar to that offered in all standard medical schools except that it also offers courses in osteopathic science. Thereafter and in September, 1960 he took and successfully passed the identical examination given by the New York State Education Department to holders of medical . degree (M.D.) licenses, and a certificate was thereupon issued to him by the Education Department of the University of the State of New York which recites that he is “ duly qualified to receive this license to practice medicine and surgery in the State of New York ’ ’. By this licensure the plaintiff was authorized and permitted to practice medicine in all of its branches *792 to precisely the same extent as the holders of any M.D. degree.[1]
The only difference between the license issued to an osteopath and the license issued to a medical doctor is that after the former’s name appear the letters “ D.O.” to indicate that he received his degree in medicine from a college of osteopathy, whereas the certificate of a graduate from a medical school has the letters “ M.D.” after the licensee’s name to indicate that his degree has been obtained from what is denominated as a school of medicine (Education Law, § 6506; § 6512, subd. 3).
In 1962 petitioner received an M.D. degree from the California College of Medicine as a result of which, at petitioner’s request, the Education Department of the 'State of New York reindorsed petitioner’s license to include the term “ M.D.” after his name in addition to that of “ D.O.”.
The Education Department of the State of New York maintains and publishes an official registry listing of all doctors licensed to practice medicine in the State of New York, but it lists separately the holders of M.D. degrees and the holders of D.O. degrees. The petitioner, at his request, is listed in that official registry among the holders of an M.D. degree.
The Regents of the University of the State of New York annually issue a certificate of registration to each physician duly licensed to practice medicine in this State. The certificate issued to the plaintiff reads “ Registered for practice as a physician M.D. 084977 ” and it recites at the foot thereof that ‘ ‘ Office display of this certificate is required by law ’ ’.
Upon applying for hospital privileges at the Peninsula General *793 Hospital, the hospital nearest to petitioner’s office, he was informed, in writing, that “ [T]be Credentials Committee has deferred action on your application since you are not a member of a county medical society” and that “Eligibility for such membership is a requirement under our by-laws ”, Petitioner was further informed that “your application will again be processed * * * when you are granted membership
Thereafter petitioner applied for membership in the Medical Society of the County of Queens, Inc., the respondent herein. He was rejected by a. letter which in effect said that he could not be admitted as a member of the society because he was an osteopathic physician and because he did not have an M.D. degree from a school of medicine approved by the society.
The position of the society is succinctly set forth in the various paragraphs of its answer and we shall deal with them seriatim.
1. THE THRESHOLD OBJECTION
The society, as a preliminary objection to the consideration of this application on the merits, contends that section 174 of the Membership Corporations Law, to which it owes its corporate existence, provides that any “ applicant for membership therein, who has been refused membership, feeling aggrieved at the action of the society, shall have the right to appeal to the Medical Society of the State of New York, in which such county medical society is represented ’ ’ and that since petitioner has not exercised and exhausted his right to appeal, as provided in the statute, this proceeding is ‘[1] premature and will not lie ’ ’.
The law does not require an exercise in futility. The adoption of the very provisions of its constitution and by-laws upon which the respondent relies for rejecting the petitioner’s application for membership were authorized by the New York State Medical Society.[2] To compel the applicant to appeal to that body in an attack by him upon a rule and regulation which it itself has affirmatively sanctioned and approved would in effiect be compelling him to appeal to a judge who has already determined *794 the issue against him. Under such circumstances- it is clear that, despite the statutory provision for internal appeals, court action is permissible when it is obvious that the taking of an internal appeal would be a futile gesture. So, too, where the rule attacked is “ v'oid.for any -reason ”, the limitation of the right to an appeal within the -framework of the society itself is not mandatory and resort may be had “ directly to the courts ” (Tesoriero v. Miller, 274 App. Div. 670, 672; Bingham v. Bessler, 10 A D 2d 345; Madden v. Atkins, 4 N Y 2d 283; People ex rel. Deverell v. Musical Mut. Protective Union, 118 N. Y. 101, 108 and 72 Harv. L. Rev. 609).
The- preliminary objection is therefore overruled - and it is determined that the maintenance of this article 78 proceeding for a mandamus- order is the proper procedural vehicle to be utilized under the circumstances (People ex rel. Bartlett v. Medical Soc. of Erie County, 32 N. Y. 187).
2. THE MERITS
The burden of the remaining defenses is that ‘ ‘ Respondent is a voluntary association and membership therein is for the sole determination of respondent”; that the respondent’s constitution, section 2-of article III, provides that “Active members shall be Doctors of Medicine, licensed to practice, in the State of New York, who have received the degree of Doctor of Medicine as a result of, completion at a College of Medicine of a course of not less than four academic years-of eight months each”; that the principles of professional conduct to which all members of respondent are required to subscribe ‘ ‘ prohibits the voluntary association of its members with cultists ” and that “ there never can be an ethical relationship between a Doctor of Medicine and a cultist, that is, .one who does not practice a system of healing founded „on a scientific basis ” and that “ the practice of-osteopathy is not deemed to be a practice of healing founded upon scientific principles, and professional association[1] by a Doctor of Medicine with an osteopath would be* considered unethical ” and that the constitution of the respondent “provides- that membership.-shall be open to ‘Doctors of Medicine licensed to practice in the State of New York ’, thereby limiting its membership to Doctors of Medicine and excluding Doctors of Osteopathy, a distinction recognized by the Education Law.” ' [1] '
In view of the conclusion to which I have come I find it unnecessary" to discuss the validity of petitioner’s M.D. degree although.-it should be noted that M.D. degrees issued by the California College of Medicine, the institution from which the *795 petitioner received his M.D. degree, are recognized as valid by the State Education Department.[3]
The “ good moral and professional medical character ” of the petitioner, which is one of the society’s conditions for admission to membership, is not placed in issue by the society. The sole ground upon which the rejection of his application for membership is sought to be sustained is that he is a graduate of a school of osteopathy, as distinguished from a school of medicine, and that he may not achieve admission to the society upon the basis of his subsequently obtained M.D. degree because it was not obtained “as a result of completion at a college of medicine of a course of not less than four academic years of eight months each ”.
The issue here, as I see it, is limited and narrow. Deduced to its simplest terms, it is whether the respondent is a private organization of the kind which can arbitrarily exclude an applicant from membership even though he has met all of the statutory requirements for the unlimited practice of medicine and surgery contained in the laws of this State.
Exclusion of a doctor from admission to a medical society, which in turn serves to bar him from hospital privileges, cannot readily be equated with the rejection of an applicant for membership in a golf club or a fraternal or social organization. One deals with good felkrwship, the other with one’s professional standing and recognition and his ability to earn a livelihood in his chosen profession. A doctor who cannot treat his patients when they require hospitalization or even arrange for their placement in a hospital is “ quite generally regarded as an outcast” from his profession (Group Health Co-op. of Puget *796 Sound v. County Med. Soc., 39 Wn. [2d] 586, 626) and he must, in the long run, suffer from economic strangulation (63 Yale L. J. 937, 951).
Looking at the matter realistically, such an exclusion amounts to a curtailment of the grant which a doctor has received from this State to practice his profession in unlimited form. Any rule or regulation of a professional society designed or calculated to effect such a purpose must be scrutinized with utmost care to see whether it is not arbitrary and unreasonable and whether in its relationship to the petitioner it does not violate his right to the equal protection and due process clauses of the Fourteenth Amendment to the United States Constitution (Railway Mail Assn. v. Corsi, 293 N. Y. 315, affd. 326 U. S. 88). Not even an honestly held belief that such exclusionary rules are in the public interest warrants the society in adopting and enforcing them if they are violative of the petitioner’s constitutional rights.
Section 6509 of the Education Law prescribes the standards to be used by the Department of Education in licensing physicians to practice their profession in the State of New York. That section, so far as here material, reads: ‘[1] Every license shall be issued by the department and shall state that the licensee has given satisfactory evidence of fitness as to age, character, preliminary and medical education, and all other matters required by law, and that after full examination, he has been found properly qu,alified to practice.” (Emphasis supplied.)
Diligent research reveals no decision in this State directly dealing with the power of a medical society to impose professional qualifications for admission more stringent than those prescribed by law. We are therefore dealing with a matter of first impression in this State. However, to deny petitioner’s application upon the basically undisputed facts in this record would in effect be conceding to any medical society the power to arbitrarily limit a licensed physician in the practice of his profession. The existence of the right to impose such a strangle hold on one’s State-authenticated right to practice his profession should not be inferred in the absence of clear and unmistakable necessity. There is no such necessity shown here.
The petitioner, as authorized by law, is now engaged in the general practice of medicine in the very county, and indeed in the very area, in which is located the hospital in which he has been denied privileges by reason of his failure to attain membership in the respondent society. Before he was awarded a license to practice medicine in this State petitioner’s “ preliminary and medical education, and all other matters required by law ” *797 (Education Law, § 6509) were investigated and after proper scrutiny, were favorably passed upon by the only body having the legal authority to do so. Conceding that respondent, in rejecting the petitioner’s application for membership, is acting in good faith and in what it conceives to be the public interest, it nevertheless seems quite clear to me that it may not constitute itself a superagency to sit in judgment upon and by its own regulations overrule and supersede the requirements laid down by the regular and legally constituted governmental agencies, thereby arrogating to itself the power to decide who is to be permitted to engage in the unlimited general practice of medicine, which is the practical economic effect of what it is doing by enforcement of the exclusionary provisions of its constitution and by-laws. Such action by it must be held to be contrary to the public interest.
Defendant, as a justification for its position, relies strongly upon Harris v. Thomas (217 S. W. 1068 [Tex. Civ. App., 1920]) in which the court decided that the local medical society was within its rights, under its rules, in rejecting the application of the plaintiff, an osteopath, for membership because membership in the medical society was a privilege which the society could accord or withhold arbitrarily without power in a court of equity to interfere even though the arbitrary rejection of the applicant prejudiced his economic interests and limited his right to practice his profession. To the- same effect see, also, State ex rel. Hartigan v. Monongalia County Med. Soc. (97 W. Va. 273) and Medical Soc. of Mobile County v. Walker (245 Ala. 135).
Those cases merely typify the reluctance evidenced by courts generally to interfere with the internal management of voluntary associations (Ann. 137 A. L. R. 311; 7 C. J. S., Associations, § 23), but they go much further than reason and justice require when they conclude — with finality — that “ The Courts cannot compel the admission of an individual into such an "association, and if his application is refused, he is entirely without any legal remedy, no matter how arbitrary or unjust may be his exclusion” (Medical Soc. etc. v. Walker, supra, p. 138).
I cannot accept such an attitude of legal paralysis to right a wrong. The cases cited, and others to the same effect, proceed on the glaringly erroneous premise that membership in a professional society, upon which one’s livelihood may well depend, can be equated with membership in a social club or fraternal organization.. There is no true analogy. The social club, or other similar organization, does not, at least directly, adversely influence the economic situation of those whom it will not accept
*798 for membership, nor does it deal with the admission of persons licensed to practice a profession by the State and whose qualifications to engage-in such a practice are predetermined by the State. There may be no public policy which forbids discrimination, fair or unfair, by such social organizations but there is, it seems to me,' quite clearly a public- policy involved when a medical society, which is in many ways an arm of the State (Education Law, § 6515; Smith v. Allwright, 321 U. S. 649, 663-664; Baldwin v. Morgan, 287 F. 2d 750, 755, n. 9; Wilson v. Thompson, 83 N. J. L. 57, 60; Yick Wo v. Hopkins, 118 U. S. 356 and 75 Harv. L. Rev. 1187) denies its imprimatur -to one licensed by the State to eng’age in the general practice of medicine if that denial is not based upon the individual’s- lack of moral integrity, nor upon, his individual lack of attainment in his profession, but is based upon the rejection in tofo of a general class of physicians called osteopaths. The discrimination thus indulged in is not .sanctioned by the State, and is based upon - the application of an arbitrary rule which completely disregards the fact that this petitioner took the very same State board’s examinations to obtain a license to practice medicine in this State that the members of the respondent society did. One may not, as an- individual, have a burning desire to join a medical-society but as a practicing physician, “ in terms of economic fact, membership in these organizations is not ‘ voluntary ’ but necessary for survival ” (65 Yale L. J. 369, 388). There is truly no free choice to join or not fo join such a-society where “ the organization has a business monopoly ” (Sebastian v. Quarter Cent. Club, etc., 327 Mass. 178, 181) or in which membership is an “ economic necessity ” (Trautwein v. Harbourt, 40 N. J. Super. 247, 264, app. den. 22 N. J. 220).
I therefore reject the reasoning and the conclusions in the Harris, Hartigan and Walker eases (supra) since I find them to be inconsistent with the requisites of justice and fair play. In the absence of any determination to the contrary in this State, I prefer to follow the reasoning contained in Falcone v. Middlesex County Med. Soc. (34 N. J. 582 [1961]).
In Falcone, the plaintiff received his D.O. degree from the Philadelphia College of Osteopathy. Thereafter he took and passed the New Jersey examinations for admission to practice medicine in that State and received an unrestricted license to so practice. He was denied admission to the Middlesex County Medical Association solely upon the ground that he had failed to spend four years at a medical school accredited and recognized by the American Medical Association.
*799 In pointed and striking language the court emphasized the nature of a medical society, its reason for being, and its obligations not only to its own members but to the public in general and to applicants for membership in it. Said the highest court of the State of New Jersey in Falcone in affirming the determination below which had ordered the respondent to admit the petitioner to membership (pp. 596-597): “It must be borne in mind that the County Medical Society is not a private voluntary membership association with which the public has little or no concern. It is an association with which the public is highly concerned and which engages in activities vitally affecting the health and welfare of the people. * * 8 Through its interrelationships, the County Medical Society possesses, in fact, a virtual monopoly over the use of local hospital facilities. As a result it has power, by excluding Dr. Falcone from membership, to preclude him from successfully continuing in his practice of obstetrics and surgery and to restrict patients who wish to engage-him as an obstetrician or surgeon in their freedom ■of choice of physicians. Public policy strongly dictates that this power should not be unbridled but should be viewed judicially as a fiduciary power to be exercised in reasonable and lawful manner for the advancement of the interests of the medical profession and the public generally; the evidence firmly displays that here it was not so exercised and that Dr. Falcone was fairly and justly entitled to the relief awarded to "him in the Law Division.” (Emphasis supplied.)
Though recognizing the right, and indeed the obligation, of a medical society to elevate professional standards, the court, in denying the right of any medical society to bar applicants from membership by reason of arbitrary educational standards set up by it, and not required by the State, continued by saying (p. 598): “In the light of all of the foregoing, the effort of the County Society to apply its unwritten requirement - of four years’ attendance at an A. M. A. approved medical college so as to exclude Dr. Falcone from membership, must be viewed as patently arbitrary and unreasonable and beyond the pale of the law. When the County Society engages in action tuhich is designed to advance medical science or elevate professional standards, it should and will be sympathetically supported. When, however, as here, its action has no relation to the advancement of medical science or the elevation of professional standards but runs strongly counter to the public policy of our State and the true interests of justice, it should and ivill be stricken down.” (Emphasis supplied.)
*800 I find Falcone a persuasive authority for the granting of petitioner’s application.[4] It reached a conclusion which appears to be legally sound and morally just.
In Matter of Salter v. New York State Psychological Assn. (14 N Y 2d 100) the petitioner. was denied admission to the respondent society and he brought an article 78 proceeding. In affirming a denial of his application the court placed its affirmance on the ground that there was no showing that the respondent association was (p. 105) “ ‘ in effect the State ’ or that it has ‘ monopoly power over the profession ’ or that its refusal to accept petitioner was ‘ arbitrary or unreasonable ’ ” and that the applicable statute for certification of psychologists required “ an even higher standard than that imposed by respondent’s by-law Under -those circumstances said the court “ respondent’s demands of its members, being less rigorous than those of the State itself, could hardly be held to be arbitrary or unreasonable as matter of law ”. Proceeding on, and to put the case before it in proper focus, vis-a-vis, Falcone, our Court of Appeals said (p. 107): “ The courts, it seems, interfere in such matters only when there is a showing of ‘ economic necessity ’ for membership ” and that “ Typical of such interventions is the Falcone case ’ ’. In approving the reasoning of and the *801 result arrived at in Falcone the court in Salter added (p. 107): “ The Supreme Court of New Jersey ordered him admitted to membership because he proved both monopoly and economic necessity. He could not 1 successfully continue his practice of surgery and obstetrics ’ without ‘ the use of local hospital facilities ’ (opn. p. 587) and the local hospitals would not (and could not if they were to keep their own accreditations) allow him to remain on their staffs after he had been refused membership in the county medical society. The Neiv Jersey courts on this whole picture could do no less them order the medical society to take him in”. (Emphasis supplied.)
The operative facts in this case coincide in all material respects with the facts in Falcone. Doctor Falcone was a graduate of the Philadelphia College of Osteopathy; the petitioner here is likewise a graduate of that school, and both Doctor Falcone and this petitioner obtained their D.O. degrees there. Here, as there, the medical society, as a prerequisite to admission, required an M.D. degree from an approved ‘ ‘ medical school ” a condition that was not complied with by Doctor Falcone in New Jersey or by this petitioner here. Here, as was Doctor Falcone there, the petitioner is actively engaged in the practice of medicine and has received an unlimited State license to practice medicine and surgery. Here, as there, there was and is an “ economic necessity” for membership in the medical society because there Doctor Falcone could not remain on the hospital staff, and here the petitioner could not obtain admission thereto, because of lack of membership in the county medical society. Thus the “ whole picture ” here is substantially the same as that in Falcone and on such a picture this court can ‘1 do no less than order the medical society to take him in ” (Salter, supra).
Since it is undeniable that this petitioner had to qualify to practice medicine and surgery in this State by passing the very same State board examinations taken by those with unquestionable M.D. degrees (Education Law, § 6506) and that the State of New York has decided, as part of its public policy, that one who has graduated from a school of osteopathy is professionally qualified to take the State board examinations, and, if he passes it, is qualified to be licensed to practice medicine in all of its branches, the constitution and by-laws of this respondent which impinge upon and attempt to fetter that right are unreasonable and void. But the offending provisions of the society’s constitution and by-laws are void not only because they violate the fundamental rights of the petitioner as an individual, but also *802 because, in. addition, the public is also injured to the extent that it is restricted in its free and voluntary choice of a physician. In United States v. American Med. Assn. (110 F. 2d 703, 712, cert. den. 310 U. S. 644) the court succinctly stated its concern for the public weal in matters such as this when it said (p. 712): “ Restraints prohibited * * * are those which unduly hinder a person from employing his talents * * * in any lawful undertaking and thus keep the public from receiving * * * services as freely as it would without such restraints ’ ’.
The assertions made in the respondent’s answer that “professional association by a doctor of medicine with an osteopath would be considered unethical ” because osteopaths are eultists, is a supercilious rejection of the public policy enunciated by this State which places those who have a D.O. degree on a professional par with those who have an M.D. degree. In addition it evinces a complete disregard of the fact that osteopaths and physicians sit together professionally on the committee on grievances ‘ ‘ to hear all charges against duly licensed physicians and osteopaths ” (Education Law, § 6515* subd. 4). Are those physicians who associate in this professional endeavor with osteopaths “ considered unethical ”? The question supplies its own answer. This blanket unethical and cultist assertion also gives scant recognition to the fact that every State in the Union, and the District of Columbia, recognize the legal right and privilege of physicians and surgeons possessing the degree of Doctor of Osteopathy to care for all diseases and ailments and that in 41 States, and the District of Columbia, osteopathic physicians and surgeons are eligible to receive an unlimited license to practice medicine and surgery (Mills, Opportunities in Osteopathic Medicine [1964], p. 65 ; 31 Notre Dame Lawyer 286, 294r-295, n. 2). So, too, does this “ cultist ” contention fail to recognize that the United States Public Health Service and the Veterans’ Administration have both long since rejected this 1 ‘ cultist ’ ’ claim by their approval of osteopathic services (63 Yale L. J., May 1954, p. 967).
The petition is in all respects granted and the respondent is directed forthwith to act upon the application of the petitioner for membership in accordance with the determination here made.

. In an effort to show that an M.D. has greater rights in the practice of medicine than does a D.O., the respondent cites Bandel v. City of New York (69 Mise. 93, affd. 144 App. Div. 938, affd. 204 N. Y. 683) for the proposition that under the New York City health law burial permits are issuable “ only by physicians having the degree of Doctor of Medicine and not by osteopaths ”. That Bandel case so decided, but it was dealing with a provision of the then Sanitary Code which had been amended to get around a decision to the contrary in the first Bandel case (193 N. Y. 133, 139) which said: “We think that when the statute and the Sanitary Code are read together, it is manifest that a duly licensed osteopath is a physician within the meaning of both”. Since the determination in the second Bandel case which was based specifically on the amended provision of the Sanitary Code restricting the signing of death certificates to “a physician on whom has been conferred the degree of Doctor of Medicine” the Sanitary Code has been superseded by the New York City Health Code (art. 205, eff. Oct. 1, 1959) and Public Health Law (tit. IV, § 4141) and the Education Law (§ 6506; § 6512, subd. 3, as amd. by L. 1961, ch. 685, efll. Sept. 1, 1961). These new laws contain no “ degree of Doctor of Medicine ” provision and were enacted to put all licensed physicians in the same category (see N. Y. Legis. Annual, 1961, pp. 212--213).

. Section 2 of article 3 of the constitution of the respondent provides: “Active members shall be Doctors of Medicine, licensed to practice in the State of New York, who have received the degree of Doctor of Medicine as a result of completion at a College of Medicine oC a course of not less than four academic years of eight months each; they shall be of good moral and professional medical character and reside or practice in the County of Queens. By virtue of their membership in the County Medical Society, they shall be members of the State Society. Only active members shall have the right to run for or hold office. For purposes of this section a college of osteopathy shall not be considered a college of medicine.” (Emphasis supplied.)

. In a letter dated March 12, 1963 Charles A. Brind, Counsel for the State Education Department of the University of the State of Mew York wrote:
“I have your letter of February 20 in relation to Dr. Stanley Josephs and other physicians similarly situated,
“It is my understanding that these physicians were originally licensed as graduates of osteopathic medical colleges, but have subsequently received the M.D. degree from the California College of Medicine.
"I have reviewed the statute with respect to the matter of registration and I am advising the Division of Professional Education that as to those osteopathic physicians who at the present time, and for the pn«t several years, have received unlimited licenses to practice medicine and surgery and who have in addition to their osteopathic degree the M.D. degree as above indicated, the biennial registration issued to such physicians will not need to refer to them as osteopathic physicians inasmuch as there is no limitation on their right to practice and they have in fact received both degrees.
“ Similarly, these physicians will in the future be listed in the general roster of physicians rather than the roster of osteopathic physicians.”

. Counsel for the Bronx County Medical Society in the correspondence column of the New York Law Journal (June 1,1965, p. 4, col. 4) has endeavored to isolate the doctrine of the Falcone case on the ground that the court there was dealing with “ the effort of the county society to apply its unwritten requirement of four year’s attendance at an A. M. A. approved medical school ”. The court however struck down the effort to exclude Dr. Falcone not because the society’s requirement was an unwritten one but because “ its action has no relation to the advancement of medical science or the elevation of professional standards but runs strongly counter to the public policy of our State and the true interests of justice ”. That the ratio decidendi for the determination in Falcone is not the fact that the rule was an unwritten, as distinguished from a written, one is made evident by a subsequent determination of the same court in Greisman v. Newcomb Hosp. (40 N. J. 389, 401). In that case the plaintiff proceeded directly against the hospital to obtain hospital privileges though not a member of the local medical society and the court in extending Falcone and explaining its holding said: “In essence Falcone declared, on strong policy grounds, that the Medical Society’s authority to pass on membership applications by licensed physicians is a power which is fiduciary in nature, to be exercised accordingly, and it held that, under the evidence presented, Dr. Falcone was entitled to admission despite the Society’s requirement of four years’ study at a school approved by the American Medical Association”. It is evident that it was “ the requirement of four years’ study at a school approved by the American Medical Association ” that was condemned by the court in Falcone and that it was not concerned with whether that requirement was written or oral.