UNITED STATES of America and Inter-
state Commerce Commission,
Appellants,

v.

The CITY OF JACKSON, MISSISSIPPI,
Allen Thompson, Douglas L. Lucky and
Thomas B. Marshall, Commissioners of
the City of Jackson, and W. D. Rayfield,
Chief of Police of the City of Jackson,
Appellees.

No. 19794.

United States Court of Appeals
Fifth Circuit.

May 13, 1963.

Robert E. Hauberg, U. S. Atty., Jackson, Miss., Bernard A. Gould, Atty., I. C.C., St. John Barrett, Atty., Dept. of Justice, Washington, D. C., Burke Marshall, Asst. Atty. Gen., Harold H. Greene, Gerald P. Choppin, Howard A. Glickstein, Attorneys, Department of Justice, for appellants.

Thomas H. Watkins, E. W. Stennett, Elizabeth W. Grayson, Jackson, Miss., for appellee.

Before WISDOM, Circuit Judge, and BOOTLE and AINSWORTH, District Judges.

WISDOM, Circuit Judge.

Since 1956 the City of Jackson, Mississippi, has maintained sidewalk signs adjacent to the Greyhound, Trailways, and Illinois Central terminals.[1] These signs read, "Waiting Room for White Only — By Order Police Department" and "Waiting Room for Colored Only — By Order Police Department." The Jackson police placed the signs in front of the same waiting rooms which were formerly restricted to "white" or "colored" respectively by the carriers under state law. The record shows that in twelve separate instances between November 1, 1961, and March 5, 1962, a Negro or Negroes entered the "White" waiting room. Jackson police officers by arrest or threat of arrest forced the Ne-

1. The Greyhound Corporation and Continental Southern Lines, Inc. (part of the Trailways System) are interstate common carriers by motor vehicle. They maintained separate facilities for the use of Negroes and white persons in each of their terminals in Jackson, Mississippi before the Interstate Commerce Commission issued its order of September 22, 1961, prohibiting any carrier's utilizing segregated terminals and posting signs indicating that facilities were separated according to race. The Illinois Central Railroad, an interstate common carrier by rail has been under the Commission's order since January 10, 1956, to cease and desist maintaining segregated facilities or using signs indicating which race was to use each facility. When the Illinois Central took down the signs, the City put them up—on the sidewalks just outside the entrances to the terminals.

groes to leave the terminals. February 2, 1962, the United States filed a complaint[2] against the City, its Commissioners, and its Chief of Police asking for injunctive relief against racial segregation in the Jackson rail and bus terminals. March 5, 1962, the United States amended its complaint by adding the Interstate Commerce Commission as plaintiff and Greyhound, Continental Southern Lines, and the Illinois Central Railroad Co. as defendants.[3] The plaintiffs then moved for a preliminary injunction enjoining the City, its Commissioners, and its Chief of Police from (a) maintaining or displaying in or near the terminals of the carriers, signs indicating or suggesting that any of the terminal facilities are for the use of persons of any particular race or color; (b) failing to remove such signs; (c) enforcing sections 2351.5, 2351.7, or 7787.5 of the Mississippi Code;[4] and (d) otherwise seeking to enforce or encourage racial segregation in the use of the terminal facilities of the carriers.

The defendants deny that they enforced segregation in the terminals or that there was any connection between the signs and the arrests or threats of arrest in the "white" waiting room. On the law, the defendants contend that the plaintiffs have no standing to sue in this action. The district court agreed with these contentions and denied the motion for a preliminary injunction. 206 F. Supp. 45. We reverse and remand with directions that the injunction be issued.[5]

---

2. The original complaint was for an injunction to prevent an "unlawful burden upon the interference with interstate commerce" in violation of the Commerce Clause, Section 8, Article 1 of the Constitution and the Laws of Congress and the orders and regulations of the Interstate Commerce Commission. Jurisdiction was alleged under Sections 1331, 1336, 1343 and 1345 of Title 28 U.S.C. and under Sections 16(12), 42, and 43 of Title 49. The amended complaint repeated these allegations. It added that the Commission had authorized the Attorney General to act as its agent in bringing the action.

3. The amended complaint charged that the defendant carriers were utilizing these facilities, in violation of Article I, Section 8 of the Constitution (the Commerce Clause); 49 U.S.C. § 3(1); 49 U.S.C. § 316(d); 49 C.F.R. 180a; and the ruling of the Interstate Commerce Commission in N. A. A. C. P. v. St. Louis-San Francisco Railroad, 1955, 297 I.C.C. 335.

4. These sections provide:
 "§ 2351.5. Every railroad company, bus company or other common carrier * * * shall cause to be * * * maintained * * * two * * * rest rooms to be exclusively used by white passengers in intrastate commerce arriving and departing from such depot, bus station or terminal * * *.
 "No white person shall enter, frequent, occupy or use the colored * * * rest rooms required by this act, and no colored person shall enter, frequent, occupy or use the white * * * rest rooms required by this act * * *.

 "§ 2351.7. * * * No white person shall enter, frequent, occupy or use the colored waiting room of any depot, bus station or terminal when such waiting room is marked in bold letters as required by law; and no colored person shall enter, frequent, occupy or use the white waiting room of any depot, bus station or terminal when same is marked in bold letters as required by law * * *.
 "§ 7787.5. * * * In such depots, bus stations or terminals there shall be constructed, provided and maintained for the white intrastate passengers a separate waiting * * * room, * * *; and in such depot, bus station or terminal there shall be constructed, provided and maintained a separate waiting * * * room for the colored intrastate passengers * * *."

5. The district court did not base its decision on the exercise of judicial discretion peculiar to motions for interlocutory equitable relief; the court disposed of all of the issues, factual and legal. The district court ruled that (1) the police were not enforcing segregation in the terminals; (2) as a matter of law the signs were within the police power of the State and were not a burden on interstate commerce; (3) the Interstate Commerce Commission's orders apply only to carriers; (4) no relief can be had against the City; (5) the plaintiffs have no right to complain under the Fourteenth Amendment. In effect, the district court disposed of the motion after a trial on the merits and after full briefs were filed on the legal questions.

## I.

The same sidewalk signs and the same segregated terminals were the subject of attack in Bailey v. Patterson, 1962, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512. The defendants in that case made many of the same points the defendants urge in the instant case. A three-judge court, with Judge Rives dissenting, abstained "to give the State Courts of Mississippi a reasonable opportunity to act," D.C., 199 F.Supp. 595. The Supreme Court vacated the judgment and remanded the case to the district court "for expeditious disposition, in light of this opinion, of the appellants' claims of right to unsegregated transportation service." The Supreme Court did not linger over the majority opinion of the district court and its application of the doctrine of abstention nor even over the propriety of a three-judge court: "We have settled beyond question that no State may require racial segregation of interstate or intrastate transportation facilities. * * * The question is no longer open; it is foreclosed as a litigable issue." The court cited Morgan v. Virginia, 1946, 328 U.S. 373, 66 S.Ct. 1050, 90 L.Ed. 1317, 165 A.L.R. 574; Gayle v. Browder, 1957, 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114; Boynton v. Virginia, 1960, 364 U.S. 454, 81 S.Ct. 182, 5 L. Ed.2d 206.

The Interstate Commerce Act makes it unlawful for any common carrier by motor vehicle engaged in interstate commerce to subject a person "to any unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever." 49 U.S.C. § 316(d). Similarly, 49 U.S.C. § 3(1) prohibits unjust discrimination by rail carriers. September 22, 1961, the Interstate Commerce Commission issued an order, effective November 1, 1961, prohibiting

any carrier from utilizing terminal facilities in which segregation is maintained and forbidding the posting of signs indicating that facilities are separated according to race.

The defendants brush off the Interstate Commerce Act, the order of the Commission of September 22, 1961, and decisions of the Supreme Court. The arguments rejected in Bailey v. Patterson; Morgan v. Virginia; Gayle v. Browder; Boynton v. Virginia and, of course, in United States v. Lassiter, W. D.La.1962, 203 F.Supp. 20, aff'd 371 U. S. 10, 83 S.Ct. 21, 9 L.Ed.2d 47 and Baldwin v. Morgan, 5 Cir., 1961, 287 F.2d 750, to mention just a few leading cases, echo and re-echo down and down through the appellees' briefs in this case. The City of Jackson and its officials blandly assert that the police are not enforcing segregation in the terminals: the sidewalks are just city streets, not part of the terminals; the signs just assist members of both races in the *voluntary* separation of the races (there is no law against that); besides, the arrests just were for breaches of the peace, not because the Negroes arrested acted contrary to any police mandate the signs expressed or because the Negro passengers violated any Mississippi segregation law. This disingenuous quibble must rest on the assumption that federal judges are more naive that ordinary men. Perhaps they are. Holmes thought so.[6] But in the sector of the law encompassed in the subject "Civil Rights", case by case federal courts have acquired a thorough education in "Sophisticated Circumvention".

 We again take judicial notice that the State of Mississippi has a steelhard, inflexible, undeviating official policy of segregation.[7] The policy is stated in its laws.[8] It is rooted in custom. The

---

6. "Judges are apt to be naif, simple-minded men, and they need something of Mephistopheles." Holmes, Speeches 102 (Boston Little Brown & Co. 1934).

7. Meredith v. Fair, 5 Cir., 1962, 298 F.2d 696.

8. The Mississippi Code, Sec. 4065.3, requires all members of the executive branch of the government of the state, including mayors and other governing officials of municipalities, chiefs of police and policemen, to prevent,

 "[T]he causing of a mixing or integration of the white and Negro races in

segregation signs at the terminals in Jackson carry out that policy.[9] The Jackson police add muscle, bone, and sinew to the signs.

It is true that the Negroes who were arrested were not charged with violation of the segregation statutes, but in every instance the Negro or Negroes were arrested for refusing to leave a "white" waiting room; Sections 2351.5, 2351.7, and 7787.5 of the Mississippi Code require the maintenance of segregated facilities in the terminals.[10] The testimony is uncontradicted that, with one possible exception, in none of the twelve instances of arrest or threatened arrest was there any disorder, loud talking, boisterous conduct, or threatening words or actions by either the Negroes or the other persons in the waiting room during the time the Negroes were there. The defendants introduced testimony concerning only one incident, that involving the Reverend Jones. However, the arresting officer, Captain Ray, admitted that Jones did not commit any provocative act other than to walk into the terminal. Ray thought that the white persons in the terminal were in an "ugly, angry mood"; five of them walked toward Jones. He did not speak to them; he "remove[d] the cause" by arresting Jones. He testified that his actions were in accordance with the policy of the City of Jackson and the Police Department. In *Bailey v. Patterson*, the Mayor of Jackson testified as to the City's policy:

"Q. * * * State your understanding of the racial policy of the City of Jackson with respect to transportation facilities in the City of Jackson. A. * * * It has been the policy of mine as chief law enforcement officer, and the members of the city council and the police department and of the people of Jackson, to maintain what has worked over the last hundred years to bring happiness and peace and prosperity to everyone within our city. *That has been done by a separation of the races, not segregation. We never refer to it as segregation.*" Bailey v. Patterson, 1961, 199 F.Supp. 595, 611.

"Discrimination does not wear its badge upon its sleeve." [11] The record in *Bailey v. Patterson* shows that Negroes using white waiting rooms ran the risk of criminal prosecution under Mississippi's breach of peace statutes. (In that case, however, the particular plaintiffs who sued were not arrested.) In Boynton v. Virginia, 1960, 364 U.S. 454, 81 S.Ct. 182, 5 L.Ed.2d 206, the plaintiff was prosecuted for trespass. In Boman v. Birmingham Transit Co., 5 Cir., 1960, 280 F.2d 531, Negro passengers who sat in the front of a bus were convicted of disorderly conduct, conspiracy to commit a breach of the peace, and breach of the peace. Here the record shows that one of the sophisticated methods for circumventing the law is for local police to eschew "segregation" laws, using in their place conventional breach of peace or trespass laws as instruments for enforc-

* * * public waiting rooms * * * by any * * * commission, * * * of the federal government, * * * and to prohibit * * * the implementation of any orders, rules or regulations of any board, commission or agency of the federal government, based on the supposed authority of said Integration Decisions, to cause a mixing or integration of the white and Negro races in * * * public waiting rooms * * * in this state." Sections 2351.5, 2351.7 and 7787.5 of the Mississippi Code, enforcement of which is sought to be enjoined in this suit, imposed criminal penalties upon carriers and passengers who fail to require or submit to segregation of the races in terminal facilities.
See also footnote 4.

9. The affidavits of both Mayor Thompson and Chief of Police Rayfield assert that the city is maintaining the racial signs at the terminals because "it is for the best interest of all of the citizens of the City of Jackson that the races be encouraged to separate voluntarily in order to promote the peace, harmony and health of all the citizens of Jackson."

10. See footnote 4.

11. Freund, Umpiring the Federal System. In Federalism-Mature and Emergent 159, 164 (Ed. MacMahon 1955).

ing segregation, euphemistically termed "separation".

The record is barren of any evidence that the signs were only a helpful hint. The signs were commands. A sign reading "By Order Police Department" carries no inference that travelers may exercise their volition in choosing waiting rooms. We find it impossible to believe that a single Negro misunderstood the plain peremptory meaning and all the implications of the signs. An FBI agent and an ICC District Supervisor testified that over a period of four weeks they made separate observations to determine the number of white persons and Negroes in each waiting room. During that period 468 white persons and no Negroes used the "white" waiting rooms, and 286 Negroes but no white persons used the "colored" waiting rooms.

■ As a corollary to the proposition that the signs were only a helpful hint, the district judge found that the words "Only" and "By Order — Police Department" were "inappropriate". But even if these words were deleted the signs would be unlawful. The sidewalk signs are in direct conflict with the Commission's order of September 22, 1961, forbidding carriers to *utilize* terminal facilities separated on the basis of race and defining "separation" as, among other things, "the display of any sign indicating that any portion of the terminal facilities are separated * * * on the basis of race." The Supremacy Clause permits no such conflict.

With or without the mandatory words, the signs constitute state action in violation of the Interstate Commerce Act, the Fourteenth Amendment, and the Commerce Clause. As Judge Johnson properly held in Lewis v. Greyhound Corporation, M.D.Ala.1961, 199 F.Supp. 210, 214 (not appealed):

■ "The contention of the defendant carriers that they are not *enforcing* segregation in the separate facilities which they maintain or utilize is not a sufficient answer to a charge of a violation of 49 U.S.C.A. § 316(d), which prohibits them from subjecting any persons to 'any unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever.' both the Interstate Commerce Commission and the federal courts have held that the maintenance of separate facilities for the two races constitutes unjust discrimination even though the use is not strictly enforced. NAACP v. St. Louis-San Francisco Railway, 397 I.C.C. 335 (1955); Baldwin v. Morgan, 287 F.2d 750 (5th Cir., 1961). * * *

■ If the existing policy and practice of affording separate facilities according to race is either enforced or authorized by state law or by any other form of state action, then the policy not only offends the provisions of the Motor Carriers Act, but also violates the Fourteenth Amendment. Browder v. Gayle, D.C., 142 F.Supp. 707, affirmed, 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114; Baldwin v. Morgan, 287 F.2d 750 (5th Cir., 1961); Boman v. Birmingham Transit Co., 280 F.2d 531 (5th Cir., 1960). * *

■ Not only does state-imposed segregation of bus passengers violate the Fourteenth Amendment, but, insofar as such segregation bears upon interstate travelers, it also offends the 'commerce clause' of the Constitution (Art. 1, Sec. 8). Morgan v. Commonwealth of Virginia, 328 U.S. 373, 66 S.Ct. 1050, 90 L.Ed. 1317."

Baldwin v. Morgan, 5 Cir., 1961, 287 F.2d 750 involved the railroad terminal station at Birmingham, Alabama, where signs were posted reading, "Colored Intrastate Passengers Waiting Room" and "Waiting Room Interstate and White Intrastate Passengers." The argument was made, as in this case, that the signs were "merely intended * * * as an invitation to each of the races to occupy [terminal] facilities separately provided in order to permit voluntary acceptance of traditional social customs in the South

\* \* \*" 287 F.2d at 753. There was no ordinance or city order regarding the posting or enforcement of the signs. This Court held that such signs could not be maintained at terminal facilities. We said:

"But the vice here is not the impermissible distinction between *inter* and *intrastate* commerce or even the absence of an explicit purpose coercively to compel segregated occupancy (as distinguished from the maintenance of separate rooms). What is forbidden is the state action in which color (i e., race) is the determinant. It is simply beyond the constitutional competence of the state to command that any facility either shall be labeled as or reserved for the exclusive or preferred use of one rather than the other of the races. Certainly the state may not directly or through a municipality prescribe that a certain area of the city is to be inhabited by Negroes, another by whites, or that such areas are to be so marked even though no sanctions are imposed as to occupancy. Cf. Shelley v. Kraemer, 1948, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161; Harmon v. Tyler, 1926, 273 U.S. 668, 47 S.Ct. 471, 71 L.Ed. 831, reversing 160 La. 943, 107 So. 704, first appeal 158 La. 439, 104 So. 200; Buchanan v. Warley, 1917, 245 U.S. 60, 38 S.Ct. 16, 62 L. Ed. 149. The factor of race is irrelevant from a constitutional viewpoint." 287 F.2d at 754.

Under *Baldwin v. Morgan* it is immaterial whether the signs are in the terminal or on the sidewalk. This Court would no more have permitted its holding to be circumvented by the dodge of putting the signs on the sidewalk than it would permit a cafeteria to be segregated in a courthouse through the instrumentality of a lease of the cafeteria to a private person. Derrington v. Plummer, 5 Cir., 1957, 240 F.2d 922, 925, cert. den'd, 1957, 353 U.S. 924, 77 S.Ct. 680, 1 L.Ed.2d 719.

■■ A terminal is not an island, entire of itself: the adjacent sidewalks are necessary to passenger use of the terminal. The sovereign power of the United States over interstate commerce is not confined within the walls of the terminals: it extends over every inch of ground in the State of Mississippi. When the City of Jackson posts signs on the sidewalks commanding or even encouraging segregation, as a result of which interstate passengers using a terminal are molested, harassed, and arrested unless they submit to the humiliation of using segregated terminal facilities, the City violates the Interstate Commerce Act and the Commerce Clause as well as the Fourteenth Amendment. No evidence in the record permits any other conclusion.

■■ The appellees' argument on standing concentrates on the view that the Fourteenth Amendment established personal rights in favor of individual persons only. Shelley v. Kraemer, 1948, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161. "Natural persons, and they alone, are entitled to the privileges and immunities which § 1 of the Fourteenth Amendment secures for 'citizens of the United States.'" Hague v. Committee for Industrial Organization, 1939, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423. The United States is not a "person" under the amendment nor is it a person under the Civil Rights Act, 28 U.S.C.A. § 1343.[12] In the absence of statutory authorization, neither the United States nor the Interstate Commerce Commission, so the defendants assert, has standing to sue, except: (1) to protect a proprietary right, (2) to litigate where the defendant has violated any act of Congress; and (3) to carry out a duty spe-

---

12. Congress rejected proposals that the 1957 Civil Rights Bill give the Attorney General the right to seek injunctions against violations of the equal protection clause. H.R. 6127, 85 Const. 1st Sess. (1957); 71 Stat. 634 (1957), 42 U.S.C. §§ 1971–95 (1958).

cifically entrusted by Congress to the executive branch.

We hold that the United States of America has standing, with and without statutory authorization, to bring this action.[13]

A. The statutory standing stems from the Interstate Commerce Act, as amended by the Elkins Act.

1. There is no serious question as to the Government's standing to sue the defendant rail and bus carriers. Section 2322 of Title 28 U.S.C.A. provides that all actions to enforce ICC orders "shall be brought by or against the United States". Part I of the Interstate Commerce Act, 49 U.S.C.A. § 16(12), authorizes the Attorney General or the Commission to sue to enforce existing ICC orders. The Elkins Act, 49 U.S.C.A. § 43, permits suits *de novo* against carriers for "any discrimination forbidden by law", even if the *discrimination is not in violation* of an existing ICC order. Part II of the Act deals with bus carriers. Section 322(b) authorizes the Commission "or its duly authorized agent" to enjoin violations of the Act or any regulation thereunder.

██ By implication these sections provide a basis for the Government's action against the non-carrier defendants. The power in the United States and in the Commission to enforce the substantive provisions of the Act must carry with it the power to make such enforcement effective. Here, enforcement can be made effective only if relief is granted against the non-carrier defendants who are causing the carriers to violate the Act. See F.R.Civ.P. 20(a) on permissive joinder of parties. See also Securities and Exchange Comm. v. Timetrust, Inc., N.D.Cal.1939, 28 F.Supp. 34.

██ In addition, while section 316(d) and section 3(1) refer only to common carriers, 18 U.S.C. § 2 makes it an offense for any person to command, induce, or cause a violation of federal law. The Elkins Act, 49 U.S.C. §§ 42, 43 vests jurisdiction in federal courts to issue injunctions to prevent violations of the Interstate Commerce Act. Anyone therefore who commands, induces, or causes another to violate sections 316(d) and 3(1), dealing with discrimination, is a principal offender under 18 U.S.C. § 2 and is subject to the court's injunctive power.

In United States v. Lassiter, W.D.La. 1962, 203 F.Supp. 20, aff'd 1962, 371 U.S. 10, 83 S.Ct. 21, 9 L.Ed.2d 47, Judge Brown, for a three-judge court, ruled, "Both the rail and bus aspects of the litigation may be maintained by either the Commission or the Attorney General under 49 U.S.C. § 43." *Lassiter* is also authority for recognition of a statutory basis for the Government's action against the City and its officials. In *Lassiter*, as in the instant case, there were non-carrier defendants. These were certain district attorneys charged with enforcing Louisiana segregation laws and certain Louisiana judges who had ordered the rail and bus carriers to replace and maintain signs which they had removed. The court held that the Elkins Act, 49 U.S.C. §§ 42, 43 conferred standing. Section 42 provides:

"In any proceeding for the enforcement of the provisions of the statutes relating to interstate commerce, whether such proceeding be instituted before the Interstate Commerce Commission or be begun originally in any district court of the United States, it shall be lawful to include as parties, *in addition to the carrier, all persons interested in or affected by the rate, regulation, or practice.* * * *" (Emphasis added.)

---

13. Three recent articles review in depth the statutes and the decisions dealing with civil rights in transportation and the standing of the Government to sue. Dixon, Civil Rights in Transportation and the ICC, 31 Geo.Wash.L.Rev. 198 (1962); Dixon, Civil Rights in Air Transportation and Government Initiative, 49 Va.L.Rev. 205 (1963); Pollak, The Supreme Court and the States: Reflections on Boynton v. Virginia, 49 Cal.L. Rev. 15 (1961).

Section 43 gives the district court wide authority to "make such other persons or corporations parties thereto as the court may deem necessary * * * and require a discontinuance of such discrimination by proper orders * * * *enforceable as well against the parties interested in the traffic as against the carrier * * *.*" (Emphasis added.)

Section 42 has been held to be applicable to both under Part I (rail carriers) and Part II (motor carriers) of the Interstate Commerce Act. See United States v. Baltimore & O. R. R., et al., 1948, 333 U.S. 169, 171 n. 2, 68 S.Ct. 494, 92 L.Ed. 618 (stock yards); B. & C. Truck Leasing, Inc. v. I. C. C., 10 Cir., 1960, 283 F.2d 163 (truck lessor); Lamb v. I. C. C., 10 Cir., 1958, 259 F.2d 358 (wholesaler-truck lessor); Drum v. United States, W.D.Okla.1960, 193 F. Supp. 275 (same); Securities and Exchange Comm. v. Timetrust, Inc., N.D. Cal., 1939, 28 F.Supp. 34. In the cases cited, except *Lassiter*, the non-carrier defendants were not state officials but were shippers having an economic tie with the carriers. There need be, however, no community of interest between the carrier and the non-carrier sought to be enjoined, and their interests may, in fact, be opposed. United States v. Baltimore & O. R. R. et al., supra. Section 42 is phrased broadly to include "*all persons interested in or affected by the rate, regulation, or practice.*" As has been often stated, the Interstate Commerce Act, as amended by the Elkins Act, has behind it the full force of the Commerce Clause giving the statute the broadest possible sweep of congressional power. Regardless of the carriers not being responsible for the signs, the carriers are utilizing terminal facilities which the City of Jackson, through police enforcement of the signs, has managed to keep segregated. Since they utilize the terminal facilities, the carriers are proper parties. Under section 42, the City and its officials are "interested" and "affected" parties; under section 43 they are "parties interested in the traffic" who should be required to discontinue their practices leading to discrimination.

In Boynton v. Virginia, 1960, 364 U.S. 454, 81 S.Ct. 182, 5 L.Ed.2d 206, a Negro passenger on a bus was arrested under a trespass statute for refusing to comply with an order to leave the premises of a "white" restaurant in a bus terminal. The Supreme Court reversed the trespass conviction because of the preemptive effect of section 316(d). In *Boynton* the discriminatory acts were committed by the restaurant owner and the police of Richmond, Virginia; here it is the City of Jackson and the Jackson police. The Supreme Court made it clear in Boynton that the applicability of section 316(d) did not turn on whether the discriminatory conduct was committed by a carrier. In the use of terminal facilities the traveling public is entitled to protection against discrimination whether by carriers or by others; "the terminal and restaurant operate[d] as an integral part of the bus carrier's transportation service for interstate passengers". The Interstate Commerce Commission, in adopting the motor carrier regulation, specifically relied upon the Boynton rule in forbidding carriers from even utilizing or making available to their passengers any terminal facilities "which are so operated, arranged or maintained as to involve any separation of any portion thereof, or in the use thereof on the basis of race, color, creed, or national origin." 49 C.F.R. 180a, section 4.

Boynton was denied the right to sit in a restaurant. Here, there was a greater denial. Negroes in the Jackson terminals ran the gauntlet: they entered through a door designated "colored only", sat in a separate waiting room, bought their tickets at a special counter, had their baggage handled separately, and used the "colored waiting rooms".

2. The City of Jackson argues that "under no circumstances can any relief be had against the City itself. Appellees cite Monroe v. Pape, 1961, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492, and Charl-

ton v. City of Hialeah, 5 Cir., 1951, 188 F.2d 421, in support of their suggestion. These cases stand merely for the proposition that Congress, in enacting 42 U.S.C. § 1983 (R.S.1979), did not intend to give a private litigant a cause of action for damages against a municipality. There is no suggestion in these cases that injunctive relief against a municipality to restrain violations of constitutional rights is improper. Indeed, such relief has long been recognized and frequently been granted in suits brought by private individuals as well as by the United States.[14] There can be no relief except by an order binding upon the City.

B. The defendants' argument against the non-statutory standing of the United States seems to be based on the notion that this proceeding is a civil rights action by the United States on behalf of certain aggrieved persons whose rights under the Fourteenth Amendment have been violated. That is not the case. This is not an action by the United States on behalf of any particular aggrieved individuals or on behalf of Negro travelers as a class. The issue is not whether the United States or the City of Jackson is a "person" within the meaning of the Fourteenth Amendment. The issue, as we see it, is whether, under the Commerce Clause, the United States has a substantive interest in the free unburdened flow of commerce, invasion of which by the state gives the United States standing to sue.[15] On this issue of non-statutory standing, the City's defiance of the Fourteenth Amendment, as required by the State's segrega-

tion policy, has importance only in its effect on interstate commerce.

The courts have long recognized the close relation between the Commerce Clause and segregation contrary to the Fourteenth Amendment.

In 1878 in Hall v. De Cuir, 1878, 95 U. S. 485, 24 L.Ed. 547, the Supreme Court held that a Louisiana statute *requiring* public carriers to give all passengers "equal rights and privileges in all parts of the conveyance" violated the Commerce Clause. The statute was applied so as to hold a steamboat owner liable for damages for assigning a colored passenger to one cabin rather than another. The Court found that the difficulties and confusion resulting from leaving the matter to the ten states bordering the Mississippi River would produce such inconvenience and unnecessary hardship as to constitute an undue burden on interstate commerce; uniformity was a must. The Court concluded:

"Commerce cannot flourish in the midst of such embarrassments. No carrier of passengers can conduct his business with satisfaction to himself, or comfort to those employing him, if on one side of a State line his passengers, both white and colored, must be permitted to occupy the same cabin, and on the other be kept separate. Uniformity in the regulations by which he is to be governed from one end to the other of his route is a necessity in his business * * *. 95 U.S. at 489."

In 1887 the Commission approved the separate-but-equal doctrine under the

14. Douglas v. City of Jeannette, 1943, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324; Holmes v. City of Atlanta, 1955, 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed. 776, affirming 5 Cir., 1955, 223 F.2d 93; Mayor and City Council of Baltimore City v. Dawson, 1955, 350 U.S. 877, 76 S.Ct. 133, 100 L.Ed. 774; affirming 4 Cir., 1955, 220 F.2d 386; Turner v. City of Memphis, 1962, 369 U.S. 350, 82 S.Ct. 805, 7 L.Ed.2d 762; Brooks v. City of Tallahassee, N.D.Fla.1961, 202 F.Supp. 56; United States v. City of Montgomery, M.D.Ala.1962, 201 F.Supp. 590; United States v. City of Birmingham, N.D.Ala.,

decided July 1, 1962; United States v. City of Shreveport, W.D.La.1962, 210 F. Supp. 36.

15. Three recent cases support the view that the Commerce Clause is self-executing in directly invalidating private unlawful burdens on commerce. Whiteside v. Southern Bus Lines, 6 Cir., 1949, 177 F. 2d 949; Chance v. Lambeth, 4 Cir., 1951, 186 F.2d 879; Lyons v. Illinois Greyhound Lines, 7 Cir., 1951, 192 F.2d 533. See Dixon, Civil Rights in Transportation, 31 Geo.Wash.L.Rev. 199, 210, 215 (1961).

Interstate Commerce Act (Council v. Western & A.R.R., 1 I.C.C. 339) and in 1896 the Supreme Court approved the doctrine under the Fourteenth Amendment. Plessy v. Ferguson, 1896, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256. Nevertheless, all during the time *Plessy v. Ferguson* was the law the Supreme Court consistently recognized that racially discriminatory conduct forbidden by the Fourteenth Amendment was a burden on interstate commerce. Until 1946 however the Supreme Court did not void under the Commerce Clause any state law compelling segregation.

In Mitchell v. United States, 1941, 313 U.S. 80, 61 S.Ct. 873, 85 L.Ed. 1244, the Supreme Court, within the separate-but-equal doctrine, held that a rail carrier had violated the Interstate Commerce Act by failing to afford Pullman accommodations to Negroes on the same basis as whites. The Court stated: "We have repeatedly said that it is apparent from the legislative history of the Act that not only was the evil of discrimination the principal thing aimed at, but that there is no basis for the contention that Congress intended to exempt any discriminatory action or practice of interstate carriers affecting interstate commerce which it had authority to reach." 313 U.S. at 94, 61 S.Ct. at 877. In a recent study of civil rights in transportation, the author observed, "Of particular interest was the use of the Fourteenth Amendment precedents, [in Mitchell] thus in effect linking the meaning of section 3(1)'s 'undue or unreasonable prejudice' phrase with the meaning of the equal protection clause".[16] Thus, state imposed racial discrimination offending the Fourteenth Amendment, even before liquidation of the separate-but-equal doctrine, is equated with "unjust discrimination" within the meaning of sections 3(1) and 316(d) of the Interstate Commerce Act.

In 1946 the Supreme Court had before it just exactly the opposite of the situation in Hall v. De Cuir. In Morgan v. Virginia, 1946, 328 U.S. 373, 66 S.Ct. 1050, 90 L.Ed. 1317, the Virginia statute in question *required* segregation of motor carrier passengers, including those on interstate journeys. The Court voided the statute under the Commerce Clause. In reaching its decision the Court analyzed the facts, emphasizing the restrictions on the passengers' freedom to choose accommodations and the inconvenience of constantly requiring passengers to change seats. The Court said:

"Because the Constitution puts the ultimate power to regulate commerce in Congress, rather than the states, the degree of state legislation's interference with that commerce may be weighed by federal courts to determine whether the burden makes the statute unconstitutional. * * * [T]his Court pointed out years ago 'that a State cannot avoid the operation of this rule by simply invoking the convenient apologetics of the police power.' Burdens upon commerce are those actions of a state which directly 'impair the usefulness of its facilities for such traffic.' * * * A burden may arise from a state statute which requires interstate passengers to order their movements on the vehicle in accordance with local rather than national requirements." 328 U.S. at 380, 66 S.Ct. at 1054.

The Court balanced the interest of the state in a segregation law under the police power against the interest of the nation in the uniform flow of interstate commerce unburdened by state racial restrictions. The balancing required a delicate hand, since under *Plessy v. Ferguson* the statute did not offend the Fourteenth Amendment. Here, the City of Jackson, unlike the State of Virginia in *Morgan,* has no valid interest in segregation to be weighed against the interest of the Nation.

In Bob-Lo Excursion Co. v. Michigan, 1948, 333 U.S. 28, 68 S.Ct. 358, 92 L.Ed.

16. Dixon, Civil Rights in Transportation and the ICC, 31 Geo.Wash.L.Rev. 198, 205–06 (1962).

455, the Court had before it a Michigan statute which, like the Louisiana law in Hall v. De Cuir, required common carriers to serve all persons alike regardless of color. The Supreme Court upheld a fine under the statute against a ferry company which had refused to carry a Negro girl on an excursion trip from Detroit to an island in Canada. Speaking for the Court, Justice Rutledge said that neither Hall nor Morgan was "comparable in its facts, whether in the degree of localization of the commerce involved * * * or in any actual probability of conflicting regulations" between United States and Canada. The Court concluded:

"It is difficult to imagine what national interest or policy, whether of securing uniformity in regulating commerce affecting relations with foreign nations or otherwise, could reasonably be found to be adversely affected by applying Michigan's statute to these facts or to outweigh her interest in doing so. Certainly there is no national interest which overrides the interest of Michigan to forbid the type of discrimination practiced here." 33 U.S. at 40.

Hall v. De Cuir; Morgan v. Virginia; and Bob-Lo Excursion Co. v. Michigan, are alive and kicking. In Colorado Anti-Discrimination Commission v. Continental Air Lines, Inc., 372 U.S. 714, 83 S.Ct. 1022, 10 L.Ed.2d 84, the Supreme Court analyzed and reconciled all three decisions. The Court held that the Colorado Anti-Discrimination Act, as applied to the hiring of airline pilots, was not violative of the Commerce Clause. Discussing Morgan v. Virginia, the Court said, "As in Hall v. De Cuir, the Court explicitly recognized the absence of any one sure test for deciding these burden-on-commerce cases." 372 U.S. at 720, 83 S.Ct. at 1025. Justice Black, for the Court, examined the facts closely, concluded that "hiring within a State of an employee, even for an interstate job [is] a much more localized matter than the transporting of passengers from State to State", and found that "the threat of diverse and conflicting regulation of hiring practices is virtually nonexistent." 372 U.S. at 721, 83 S.Ct. at 1025. The Court observed that in Hall and Morgan the validity of laws requiring and forbidding segregation was assumed; the "kind of burden that was thought possible in the Hall and Morgan cases, therefore, simply cannot exist here." 372 U.S. at 721, 83 S.Ct. at 1026. Finally, the federal statute had not so pervasively covered the field of protecting people in interstate commerce from racial discrimination that the States are barred from enacting legislation in this field. "[T]o hold that a state statute identical in purpose with a federal statute is invalid under the Supremacy Clause, we must be able to conclude that the purpose of the federal statute would to some extent be frustrated by the state statute. We can reach no such conclusion here." 372 U.S. at 722, 83 S.Ct. at 1026.

Under Hall v. De Cuir; Morgan v. Virginia; Bob-Lo Excursion Co. v. Michigan, and Colorado Anti-Discrimination Commission v. Continental Air Lines, there is no one sure test whether a state regulation affecting interstate transportation offends the Commerce Clause. In each case there must be a "particularized inquiry" into the extent of the practical interference with the uniform free flow of commerce.

The Colorado case, like Hall v. De Cuir, concerned state action affecting interstate commerce that was attacked under the Commerce Clause even though the state legislation in question was consistent with the national interest. But segregation of travelers, intrastate or interstate, is inconsistent with national policy, a per se violation of the Fourteenth Amendment. Gayle v. Browder, 1957, 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114; Boynton v. Virginia, 1960, 364 U.S. 454, 81 S.Ct. 182, 5 L.Ed.2d 206; Bailey v. Patterson, 1962, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512; Turner v. City of Memphis, 1962, 369 U.S. 350, 82 S.Ct. 805, 7 L.Ed.2d 762.

No delicate touch is required in weighing unlawful state action against national policy. This is doubly true in a

constitutional area, interstate commerce, in which the Federal Government has unquestioned paramount interest.

 When a State, not by some sporadic act against a particular individual but by a law or pattern of conduct, takes action motivated by a policy which collides with national policy as embodied in the Constitution, the interest of the United States "to promote the interest of all" gives it standing to challenge the State in the courts. When the action of a State violative of the Fourteenth Amendment conflicts with the Commerce Clause and casts more than a shadow on the Supremacy Clause, the United States has a duty to protect the "interests of all". The courts offer the first avenue for counter-action by the Nation. Such thinking may take us down the road to recognition of Government standing to sue under the Fourteenth Amendment or under any clause of the Constitution. But this case is only a way station. The issue here is framed by the Commerce Clause. Under that clause there is authority for the United States to sue without specific congressional authorization.

In re Debs, 1895, 158 U.S. 564, 15 S. Ct. 900, 39 L.Ed. 1092, holds that the Commerce Clause in itself prohibits obstructions to interstate commerce and that the United States has standing to sue for injunctive relief to enforce the Commerce Clause. In that case the obstruction was a Chicago railroad strike and the suit was against private persons. Justice Brewer said:

> "Two questions of importance are presented: First. Are the relations of the general government to interstate commerce and the transportation of the mails such as to authorize a direct interference to prevent a forcible obstruction thereof? Second. If authority exists, as authority in governmental affairs implies both power and duty, has a court of equity jurisdiction to issue an injunction in aid of the performance of such duty." 158 U.S. at 584, 15 S.Ct. at 906.

Although the Government's proprietary interest in the mails was sufficient to permit the suit, the *Debs* Court was not content to rest its holding on that kind of governmental interest:

> "We do not care to place our decision upon this ground alone. Every government, entrusted, by the very terms of its being, with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other, and it is no sufficient answer to its appeal to one of those courts that it has no pecuniary interest in the matter. *The obligations which it is under to promote the interest of all, and to prevent the wrongdoing of one resulting in injury to the general welfare, is often of itself sufficient to give it a standing in court.*" (Emphasis added.) 158 U.S. at 584, 15 S.Ct. at 906.

The language is broad. The Court conceded that the Government could not "interfere in any mere matter of private controversy between individuals" but concluded: "[W]henever the wrongs complained of are such as affect the public at large, and are in respect of matters which by the Constitution are entrusted to the care of the Nation, and concerning which the Nation owes the duty to all the citizens of securing to them their common rights, then the *mere fact that the government has no pecuniary interest in the controversy is not sufficient to exclude it from the courts, or prevent it from taking measures therein to fully discharge their constitutional duties.*" (Emphasis added.) 158 U.S. at 586, 15 S.Ct. at 906.

*Debs* has been relied on as a basis for standing in three recent cases in this circuit: United States v. Lassiter, W.D. La.1962, 203 F.Supp. 20, aff'd 371 U.S. 10, 83 S.Ct. 21, 9 L.Ed.2d 47; United States v. Klans, M.D.Ala.1961, 194 F. Supp. 897; and United States v. City of Montgomery, M.D.Ala.1962, 201 F. Supp. 590.

In *Lassiter,* as in the instant case, the defendants were bus and rail carriers as well as state officials. Also as in this case, the burden on commerce was the segregation of passengers in terminals having separate waiting rooms with segregation signs. The three-judge court, among other bases for the Attorney General's standing, relied upon the *Debs* principle that the executive branch had the power to seek an injunction against "unconstitutional interference with and burden upon interstate commerce". The court cited *Klans* with approval.

*Klans* was a suit by the United States to enjoin various Ku Klux Klans and certain state officials, including the Alabama Attorney General and local officials, from committing acts of violence against "freedom riders" and from permitting others to interfere with interstate travelers. The Court held that the failure of the defendant law enforcement officers to enforce the law amounted to unlawful state action in violation of the Fourteenth Amendment. The unlawful state action therefore was analogous to violations of the Fourteenth Amendment in *Lassiter* and in the instant case. Judge Johnson "conclude[d] that this action [was] brought by the United States to protect the interest of citizens of the United States in the free and unobstructed movement of interstate commerce and in the exercise of the constitutional power of the United States over such commerce." The court, relying on *Debs*, recognized the standing of the United States:

> "The national government * * is charged, therefore, with the duty of keeping those highways of interstate commerce free from obstruction, for it has always been recognized as one of the powers and duties of a government to remove obstructions from the highways under its control." 194 F.Supp. at 902.

In *United States v. City of Montgomery,* the Government sued to desegregate airline terminals. Judge Johnson held that the Government had both statutory standing to enforce the non-discrimination clause of the Federal Aviation Act, 49 U.S.C. § 1487(b), although it refers only to "air carrier", and standing under the *Debs* principle "to maintain an action to relieve burdens on interstate commerce."

We see no reason for distinguishing *Debs* on the ground that there the Supreme Court spoke in terms of the executive's duty to use force or to seek an injunction to "prevent a *forcible* obstruction" of commerce. A non-forcible obstruction may be just as serious an invasion of the Federal Government's constitutional powers as a strike or mob action, as in *Klans.* It is in this case: here it is coupled with a challenge to national policy as expressed in the Fourteenth Amendment, the Interstate Commerce Act, and numerous congressional acts and Commission orders. No one will ever know to what extent segregation has obstructed travel. It is evident however: "[S]egregation in travel, and in travel-related accommodations such as facilities in terminals, involves a flaunting of the color-line in a personal setting and in the routine of life. It thus takes on a specially offensive quality, all the more galling for being so overt." [17] This must be considered in context. That context includes arrests subjecting travelers to criminal punishment under color of law, a burden more oppressive and at least as effective an interruption of travel as sporadic, temporary mob action.

A proprietary interest provides a non-statutory basis for standing of private persons and would provide a basis for the United States to sue, but there is no reason to restrict the Nation's non-statutory rights of action within the same limits established for private persons. The Constitution cannot mean to give individuals standing to attack state action inconsistent with their constitutional rights but to deny to the United States

---

17. Dixon, Civil Rights in Air Transportation and Government Initiative, 49 Val.L.Rev. 205–06 (1963).

standing when States jeopardize the constitutional rights of the Nation. Or that the United States may sue to enforce a statute but not sue to preserve the fundamental law on which that statute is based. Or that the United States may sue to protect a proprietary right but may not sue to protect much more important governmental rights, the existence and protection of which are necessary for the preservation of our Government under the Constitution.

In an important case, United States v. San Jacinto Tin Co., 1888, 125 U.S. 273, 8 S.Ct. 850, 31 L.Ed. 747 the Attorney General brought suit to set aside a land patent obtained by fraud. The Supreme Court held:

"[N]otwithstanding the want of any specific authority to bring an action in the name of the United States to set aside and declare void an instrument issued under its apparent authority, we cannot believe that where a case exists in which this ought to be done it is not within the authority of that officer to cause such action to be instituted and prosecuted." 125 U.S. at 279, 8 S.Ct. at 853.

In United States v. American Bell Telephone Co., 1888, 128 U.S. 315, 9 S.Ct. 90, 32 L.Ed. 450, the Court upheld the right of the United States to maintain without statutory authorization a bill in equity to cancel a patent for an invention fraudulently obtained. Referring to San Jacinto Tin, the Court said:

"This language is construed by counsel for the appellee in this case to limit the relief granted at the instance of the United States to cases in which it has a direct pecuniary interest. But it is not susceptible of such construction. * * * The essence of the right of the United States to interfere in the present case is its obligation to protect the public from the monopoly of the patent which was procured by fraud, and it would be difficult to find language more aptly used to include this in the class of cases which are not excluded from the jurisdiction of the court by want of interest in the government of the United States." 128 U.S. at 367, 9 S.Ct. at 97.

In Sanitary District of Chicago v. United States, 1925, 266 U.S. 405, 45 S.Ct. 176, 69 L.Ed. 352 the Court sustained a suit for the removal of obstructions to interstate commerce in navigable waters. Justice Holmes said:

"This is not a controversy between equals. The United States is asserting its sovereign power to regulate commerce and to control the navigable waters within its jurisdiction. * * * The main ground is the authority of the United States to remove obstructions to interstate and foreign commerce. There is no question that this power is superior to that of the States to provide for the welfare or necessities of their inhabitants. In matters where the States may act the action of Congress overrides what they have done. * * * But in matters where the national importance is imminent and direct even where Congress has been silent the States may not act at all." 266 U.S. at 425–26, 45 S.Ct. at 178.

We summarize. At a time when *Plessy v. Ferguson* made resort to the Fourteenth Amendment futile, the Supreme Court, in *Morgan v. Virginia*, barred state-imposed segregation in transportation because it offended the Commerce Clause. *Lessiter, Klans,* and *City of Montgomery, now reinforced by dicta in Colorado Anti-Discrimination Commission v. Continental Air Lines,* hold that segregation in interstate transportation violative of the Fourteenth Amendment offends the Commerce Clause. *Debs, Morgan, Boynton, Lassiter,* and *Klans* together recognize the substantive interest of the United States in the exclusive control over interstate commerce and in protecting the flow of interstate commerce free from interruption and burdensome interference by segregation imposed on travelers whether it be **by**

the states, carriers, or private persons. *Debts, Lassiter, Klans,* and the *City of Montgomery* support the direct standing of the United States to protect that substantive interest under the Commerce Clause without benefit of statutory authorization.

Through the ill-starred doctrine of interposition, a repudiated political theory that never existed in law but exists in fact in defiance of the Rule of Law, a State or a City, a Governor or a police officer may hamstring the Nation. There is much to be said therefore for recognition of the interest of the United States in all of the Constitution and the Nation's right to resort to the courts for effective relief whenever a State violates any clause of the Constitution. A great deal can be said for allowing the United States to sue to prevent a State from using its governmental powers to bring about a systematic deprivation of the rights of its American citizens guaranteed by the Constitution. Government counsel argue, strongly and ably, that wholly aside from the Commerce Clause the United States has standing under the Fourteenth Amendment. Here, however, the plaintiffs seem to have authority to sue under the Interstate Commerce Act and any doubt as to the right to bring this action under that statute is cured by our holding that the United States has non-statutory standing under the Commerce Clause. In the circumstances of this case, therefore, the rights of the traveling public, national policy, and the fundamental law of the land are protected without the necessity of holding that the United States has standing to sue under the Fourteenth Amendment and without resorting to the Necessary and Proper Clause to make effective the Supremacy Clause.

■ The Court has considered all of the contentions of the defendants-appellees, whether or not referred to in this opinion. We hold that the law and the evidence allow no area within which the district court might exercise judicial discretion to deny the plaintiffs' motion for a preliminary injunction. The dis-

trict court's failure to issue the injunction constituted, therefore, an "abuse of judicial discretion", as that phrase is used in the law. The judgment below is reversed and the case remanded to the district court with instructions that the injunction be issued as prayed for by the plaintiffs.